UNIROYAL, INC., ET AL. *v.* BOARD OF TAX REVIEW OF THE TOWN OF MIDDLEBURY

COTTER, C. J., BOGDANSKI, PETERS, HEALEY and PARSKEY, Js.

Argued November 14, 1980—decision released January 20, 1981

*Jonathan S. Bowman,* with whom was *Herbert L. Cohen,* for the appellants (plaintiffs).

*Joseph Adinolfi, Jr.,* with whom were *Brian A. Barnes* and, on the brief, *Donald W. O'Brien,* for the appellee (defendant).

COTTER, C. J. The plaintiffs, pursuant to § 12-118 of the General Statutes,[1] appealed to the Superior Court from the refusal of the board of tax review of the town of Middlebury to reduce the valuation of its land and buildings located within the town. The appeal was referred to a state referee exercising the powers of the Superior Court who decided that the plaintiffs were not aggrieved by the refusal of the board of tax review to reduce the assessments on their property for the October 1, 1975, 1976 and 1977 grand lists.

The land and buildings involved in this appeal are owned by the Metropolitan Life Insurance Company and leased to Uniroyal, Inc. The Uniroyal complex consists of 112 acres of land, 106 of which,

[1] "[General Statutes] Sec. 12-118. APPEAL FROM BOARD OF TAX REVIEW. Any person, including any lessee of real property' whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review in any town or city may, within two months from the time of such action, make application, in the nature of an appeal therefrom, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. . . . The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable . . . ."

together with the buildings, are located in Middlebury. The buildings on the land consist of a corporate headquarters office complex, research and training facilities, dining and temporary housing accommodations, and mechanical services buildings. The complex may be best described as a campus style corporate headquarters.

The present case is the second assessment-valuation appeal taken in the prolonged dispute between the plaintiffs and the town of Middlebury. As our opinion in *Uniroyal, Inc.* v. *Board of Tax Review,* 174 Conn. 380, 389 A.2d 734 (1978) (hereinafter *Uniroyal I*), details, the underlying circumstances leading to these appeals began with the 1969 agreement between Uniroyal, Inc., and the Metropolitan Life Insurance Company. Pursuant to the agreement, Uniroyal conveyed land to Metropolitan upon which Metropolitan was to finance construction of a corporate headquarters and research facility for Uniroyal. The agreement provided that Uniroyal was to pay annual rent equal to 9.2 percent of the total cost of the project. An amendment to the lease indicates that the total cost of construction was $42,500,000 and that the annual rent would be $3,910,000 per year. The term of the lease was twenty-eight years, commencing on December 1, 1972. Uniroyal has the option of extending the lease for two ten-year periods at a reduced rental of 4 percent per annum. The lease also included a purchase option: Uniroyal may purchase the property at the end of twenty years for a purchase price of $25,972,686 or at the end of the twenty-eight year base lease for a price set at $10.7 million.

The protracted history of this assessment disagreement began in August, 1972, when Uniroyal

gave a list of completed items of construction to the board of assessors. On the October 1, 1972 grand list the Uniroyal property was listed at a full value (100 percent) of $16,966,692.[2] Prior to establishing the grand list of October 1, 1973, the assessors received the report of a real estate appraiser regarding the valuation of the Uniroyal complex. The board rejected the private appraiser's report and, applying its own methods, initially determined the value of the property to be $39,100,000. In January, 1974, a series of meetings between Uniroyal and representatives of the board resulted in a reduction of the full valuation to $32,959,760, resulting in an assessment of $21,423,840. This valuation has remained constant for the years involved in this appeal (1975, 1976 and 1977). Such a valuation represents the board's assessment of what the property's value would have been on October 1, 1971, the date all property in Middlebury was last revalued.

I

The plaintiffs allege, inter alia, that the valuation was manifestly excessive and raise two issues on appeal. We first address their claim that the referee erred in not concluding that their property is bear-

---

[2] The valuation of the 1972 grand list was merely an interim valuation and thus not binding on the town for subsequent years. The Uniroyal complex was not completed until July 1, 1972, and the low 1972 assessment indicates only that the assessors did not have sufficient time to evaluate the information provided by the company as late as August, 1972, a mere month before the publication of the 1972 grand list. Thus, rather than the 1972 assessment setting a binding figure, the plaintiffs actually benefited from the town's inability fully to assess the subject property in time for inclusion on the 1972 grand list. We also note that any allegation otherwise could (and should) have been raised in *Uniroyal I* regarding the 1973 assessment. Any claim along these lines is effectively barred. See Part II infra.

ing a disproportionately high burden of taxes in the town of Middlebury and in failing to equalize the tax burden to that of other property in the town.

In Connecticut, the procedure for taxation of real property is set forth in General Statutes § 12-64, which provides that all non-exempt real estate "shall be liable to taxation at a uniform percentage of its present, true and actual valuation[3] to be determined by the assessors . . . ." The three steps necessary to carry out the mandate of § 12-64 are: "(a) The fair value of property as of the assessment date must be determined. (b) A percent, not exceeding 100 percent, of the fair value, must be determined by the assessing authority for uniform application to all property within the town. (c) The assessment value, i.e., the value for the purpose of taxation, for any given piece of property in the town, must be ascertained by applying the determined uniform percent to its fair value as of the assessment date." *Lerner Shops of Connecticut, Inc.* v. *Waterbury,* 151 Conn. 79, 85, 193 A.2d 472 (1963). The plaintiff's first claim asserts that the Middlebury assessment procedure departs from the formula set forth in *Lerner Shops of Connecticut, Inc.* v. *Waterbury,* supra.

The plaintiffs introduced evidence of the average ratio of the assessed values of Middlebury properties to their actual selling prices for the years 1971–1978. The plaintiffs' expert, Edwin L. Haflich, a real estate appraiser, purported to analyze every real property sale recorded in the Middlebury town clerk's office for the period October 1, 1971 through

---

[3] The terms actual valuation, market value, actual value, fair market value, market price and fair value are synonymous in the valuation of property for assessment purposes. *Bridgeport Gas Co.* v. *Stratford,* 153 Conn. 333, 335, 216 A.2d 439 (1966).

August 30, 1978.  The Haflich study ascertained the following ratios between assessed values (65 percent) and the sales occurring in each year:[4]  43 percent in 1975; 40 percent in 1976; and 36 percent in 1977.

On the basis of the Haflich study, the plaintiffs argue that because the ratio of assessed value to sales price has varied greatly from the 65 percent target of the town assessors, valuation of its property at 65 percent forces it to bear a disproportionately large portion of the Middlebury tax burden. The plaintiffs rely on our language in *Kays, Inc.* v. *Board of Tax Review,* 170 Conn. 477, 481, 365 A.2d 1207 (1976), stating that proof of an average ratio of the assessed value of properties to their present market values, if credited by the trial court, could be the basis for reduction of an individual assessment to the percentage computed by that ratio. Although our previous opinions have recognized the usefulness of average ratio analysis to establish the unfairness of assessment practices,[5] we have carefully limited use of the ratio as a *remedy* to cases where the evidence clearly establishes that the assessor failed to follow the requirements of General Statutes § 12-64.  In *Kays* we found no error in the trial court's conclusion that the evidence presented was insufficient to establish an average ratio. *Kays, Inc.* v. *Board of Tax Review,* supra, 482.

[4] The ratios were calculated according to the following formula: the assessed value (AV) (65 percent) of each property sold in a particular year was compared to the actual sales price received (ASP) and the resulting ratio (AV/ASP) was listed for each property sold in a particular year.  A median value for each year was established and it is this median figure which appears in the text.

[5] See generally Hellerstein & Hellerstein, State and Local Taxation, pp. 126–27, 134, 151 (1978); note, "The Road to Uniformity in Real Estate Taxation: Valuation and Appeal," 124 U. Pa. L. Rev. 1418, 1440–43, 1447 (1976).

In *Lerner Shops of Connecticut, Inc.* v. *Waterbury*, supra, relied upon by the plaintiffs, the town of Waterbury conducted its 1960 revaluation by assessing each parcel of real property at 100 percent of its 1945 fair market value. Rather than following General Statutes § 12-62,[6] requiring the periodic revaluation of real estate, the Waterbury assessment at issue in *Lerner Shops* was merely a revitalized fifteen-year-old grand list. As this court stated, "it is obvious that such an assessment value would not be the equivalent of any uniform percentage of the 1960 fair market values of property, as required by the statute for a legal assessment." *Lerner Shops of Connecticut, Inc.* v. *Waterbury*, supra, 87. In *Lerner Shops* we based our acceptance of the average ratio remedy upon our finding that "Waterbury wholly failed to carry out this statutory mandate and, indeed, ignored it." *Lerner Shops of Connecticut, Inc.* v. *Waterbury*, supra, 85. No similar practice of deliberately

---

[6] Prior to the amendment by Public Acts 1974, No. 74-253, General Statutes § 12-62 provided: "PERIODIC REVALUATION OF REAL ESTATE. The assessors of all towns, consolidated towns and cities and consolidated towns and boroughs, unless otherwise provided, shall, during each period of ten years after February 1, 1930, view all of the real estate of their respective municipalities, and shall revalue the same for assessment and, in the performance of these duties, except in any municipality where there is a single assessor, at least two of the assessors shall act together, and all valuations shall be separately approved by a majority of the assessors."

Subsequent to the 1974 amendment, § 12-62 provided: "PERIODIC REVALUATION OF REAL ESTATE. Commencing October 1, 1978, the assessors of all towns, consolidated towns and cities and consolidated towns and boroughs shall, no later than ten years following the last preceding revaluation of all real property and every ten years thereafter, view all of the real estate of their respective municipalities, and shall revalue the same for assessment and, in the performance of these duties, except in any municipality where there is a single assessor, at least two of the assessors shall act together, and all valuations shall be separately approved by a majority of the assessors."

ignoring the statutory command exists in this case. The Middlebury assessor revalued all property as of October 1, 1971, as mandated by the statutes. Therefore, any violation of the statute in this case requires proof that the assessor's efforts to comply with the statute failed to accomplish the intended purpose of establishing a fair valuation. Legislatures have broad powers of taxation and they may prescribe the conditions, means and methods of assessment, levy and collection of taxes. *Bassett* v. *Rose*, 141 Conn. 129, 134-35, 104 A.2d 212 (1954). Any taxing power thus given must be exercised in strict conformity with the granting legislation. *Pepin* v. *Danbury*, 171 Conn. 74, 83, 368 A.2d 88 (1976).

The decisions of this court indicate that use of the average ratio approach is not a supplement to fair valuation as mandated by the statute; it is appropriate only as an evidentiary tool useful in establishing that the statutory requirements have not been followed and as a remedy for such failure. The plaintiffs have introduced the average ratio evidence in an effort to demonstrate that although the assessor applied a 65 percent valuation factor to their property, he actually applied a much lower valuation to other Middlebury property. See note, "The Road to Uniformity in Real Estate Taxation: Valuation and Appeal," 124 U. Pa. L. Rev. 1418, 1441 (1976). Such a practice would violate the requirements of General Statutes § 12-64. The plaintiffs would be "entitled to relief under § 12-118 if [they] could prove that [their] property was bearing a disproportionately high tax burden because of the defendant's failure to comply with § 12-64." *Kays, Inc.* v. *Board of Tax Review*, supra, 481, quoting *Lerner Shops of Connecticut, Inc.* v.

*Waterbury,* supra, 86. As our cases indicate, relief under § 12-118 is conditioned upon proof of failure to comply with § 12-64.

The average ratio evidence produced by the plaintiffs does not prove any violation of the statutory scheme. The plaintiffs argue that because the uniform percent in Middlebury was 65 percent and the average ratio evidence indicated that the actual relation between sales price and assessed value ranged from 43 percent in 1975 down to 36 percent in 1977, they were entitled to a reduction in their assessed value from 65 percent of full value to the 40 percent range. Analysis of the plaintiffs' claim reveals its inconsistency.

Comparison of the average ratio of 1975, 1976, and 1977 sales price to assessed value in 1971 indicates only that real estate values in Middlebury increased from 1971 to 1975–77. All property was assessed on the grand list at 65 percent of the 1971 valuation. That the relation between the selling price in 1976 and the assessed value (at 1971 prices) was 40 percent reveals that the price of the average parcel increased by 63 percent in the five years between 1971 and 1976. By way of illustration, assume a property is valued at $100,000 in 1971 and its assessed (65 percent) value is set at $65,000. On the 1975, 1976 and 1977 grand lists, the assessed value remains $65,000. If that property were sold in 1976, the plaintiffs' average ratio evidence indicates that it would likely be sold at a price such that its assessed value would be only 40 percent of its actual sales price. Performing the calculation, $65,000 is 40 percent of a sales price of $162,500. Thus the evidence adduced by the plaintiffs reveals primarily that real estate values were increasing during this period.

The plaintiffs' evidence is unconvincing in yet another aspect. The average ratio data compares actual sales price (ASP) to assessed value (AV), indicating a ratio of 40 percent. The plaintiffs then make an illogical jump. They claim that because the relation between assessed value as of 1971 (AV 1971) and actual sales price in 1976 (ASP 1976) is 40 percent, this court must adjust the assessed value of the subject property so that the ratio of the assessed value in 1971 (AV 1971) to the full value in 1971 (FV 1971) is also 40 percent. This leap in logic fails because there is no economic justification for the plaintiffs' claim that the actual sales price of Middlebury properties in 1976 is determinative of the true value of the subject property in 1971.

The plaintiffs' evidence also suggests the logical inference that the value of the subject property itself would have reflected the general appreciation in real estate values that seems to have occurred in Middlebury during the 1970s. It is reasonable to surmise that if the subject property were to have been sold in 1976, the ratio of its assessed value (1971) to its actual sales price (1976) would result in a ratio significantly lower than 65 percent. This is the crux of the plaintiffs' seeming insistence that we compare a set of circumstances which are incomparable. Comparison of 1976 actual sales prices for other Middlebury property to the 1971 full value of the subject property is of little probative value. The plaintiffs' evidence demonstrates only that the actual value of most property in 1976 was higher than the 1971 assessed value. Comparison of the assessed value (AV) to the actual sales price in 1970–71 (ASP 1971) indicates that the Middlebury assessment was accurate as to 1971 values. Thus

a comparison of the AV (1971) to the ASP (1971) reveals that the median assessment ratio was 64 percent, almost precisely equal to the assessment target of 65 percent.

The plaintiffs' property most likely benefited from continued use of the 1971 valuation figures for assessment purposes throughout the 1970s and the failure of the 1971 figures to reflect property value increases in subsequent years as much as any other property owner. Such variation accruing within ten-year periods is a permissible variation under the legislative scheme for assessment. General Statutes § 12-62. We have said that: "Tax assessors are required to recognize and act on the principle that the true value of a fixed asset such as real estate is fairly constant and must be gauged, not by conditions temporary and extraordinary, but by those prevailing over a period of time, and the assessors, in listing values of property for taxation, may, to a certain extent, disregard the excesses of a boom as well as the despair of a depression. *Alfred J. Sweet, Inc.* v. *Auburn,* 134 Me. 28, 32, 180 A. 803." *Burritt Mutual Savings Bank* v. *New Britain,* 146 Conn. 669, 677–78, 154 A.2d 608 (1959).

In Connecticut, the remedy for variations in the effect of market conditions on different parcels is set forth in General Statutes § 12-62. The remedy of revaluation was established by the legislature and it was the judgment of the legislature that the remedy need only be available once each decade. See *Bassett* v. *Rose,* supra, 135. By way of contrast, § 12-64 "is concerned with the manner of taxation, not the frequency of valuation, and it does not purport to require assessors to be updated on their valuations at all times. . . . [A]s a practical

matter, assessors cannot be expected to revalue every year, even though changes which affect property values may occur within a given year." *Kays, Inc.* v. *Board of Tax Review,* supra, 480.

Because the remedy for changing market values is set forth in General Statutes § 12-62, we conclude that use of the average ratio approach is not applicable to discrepancies in valuation which arise during the ten-year period between valuations. See *Burritt Mutual Savings Bank* v. *New Britain,* 146 Conn. 669, 678–79, 154 A.2d 608 (1959). Thus, so long as the Middlebury valuation established in 1971 fairly reflected 1971 values, we do not utilize the average ratio evidence to remedy any discrepancies which might occur as 1971 assessments were carried forward through the decade. Cf. *Chamber of Commerce of Greater Waterbury, Inc.* v. *Murphy,* 179 Conn. 712, 427 A.2d 866 (1980) (Mandamus directing city assessor to fulfill statutory duty of revaluing real property every ten years in accordance with General Statutes § 12-62). The ratio can be utilized to demonstrate the unfairness of the 1971 valuation. It may also be utilized if the town should fail to perform the statutorily required revaluation in the 1980s. See *Lerner Shops of Connecticut, Inc.* v. *Waterbury,* supra.[7]

---

[7] The average ratio technique is useful both as evidence of, and as a remedy to cure, a failure of the assessing authority to follow equitable procedures or the statutory requirements, or to correct its clear error. It should be understood that our acceptance of the average ratio *remedy* is restricted to situations where the plaintiffs have carried the initial burden of demonstrating inequitable assessments. In some situations, reasons of public policy, expense or inconvenience restrict the remedy the courts may choose. In such circumstances the court may not order full revaluation of all prop-

## II

The plaintiffs' second claim of error is that the referee erred in determining the fair value of the property as of the assessment dates (October 1, 1975, October 1, 1976, and October 1, 1977). We note that the assessment approved by the referee

erties, yet may seek to provide justice to the successful plaintiff. The average ratio method is available as a remedy providing justice to the litigant at a lesser societal cost than an order requiring full revaluation.

It is also important to note that the cases from other jurisdictions in which courts have permitted use of the average ratio technique may not be relevant to Connecticut assessment practices. Many other states have no statutory provision for revaluation or means of ordering compliance with such a statute. See note, "The Road to Uniformity in Real Estate Taxation: Valuation and Appeal." 124 U. Pa. L. Rev. 1418, 1419–20 (1976). In such a situation the courts have been especially likely to apply the average ratio remedy so as to provide the discriminated against litigant with a remedy for the proven wrong. We emphasize that this situation is less likely to exist in Connecticut where the legislature has established a procedure which ensures periodic updating of assessment values. Cf. *Chamber of Commerce of Greater Waterbury, Inc.* v. *Murphy,* 179 Conn. 712, 427 A.2d 866 (1980) (Mandamus directing city assessor to fulfill statutory duty of revaluing real property every ten years in accordance with General Statutes § 12-62).

Cases cited by the plaintiffs in which the average ratio remedy has been utilized are distinguishable from the present factual situation. In *Siegal* v. *Newark,* 38 N.J. 57, 183 A.2d 21 (1962), commercial and industrial properties were assessed at a "common level" of 70 percent of true value while residential properties were assessed at 40 percent of true value. Such an assessment process violated the New Jersey constitution. In *Baken Park, Inc.* v. *County of Pennington,* 79 S.D. 156, 109 N.W.2d 898 (1961), the court found that the difference in assessment levels was due to deliberation or intention rather than mathematical inaccuracy. The court reiterated the trial court's finding that the evidence indicated that no effort had been made to assess property at any consistent percentage of full value. The defendant conceded that one area of the county was favored by taxing authorities to the disadvantage of other properties. The court concluded that the evidence justified relief from the "discriminatory assessment."

The seminal case involving application of the average ratio remedy is *In re Appeals of Kents 2124 Atlantic Avenue, Inc.,* 34

is the same assessment upheld by this court in *Uniroyal I* for the October 1, 1973 and October 1, 1974 grand lists. *Uniroyal I,* supra, 382, 391.

The plaintiffs contest the full value assessment in two aspects: as the final step in the application of the average ratio remedy and as a separate claim of error based solely on the alleged excessiveness of the valuation. We need not address the claim in either of its guises.

---

N.J. 21, 166 A.2d 763 (1961). In *Kents,* the court found that "The testimony of the assessors in the present case reveal[ed] a total indifference to their statutory duty. The assessment rolls were copied year after year, with no effort to achieve a general revaluation. Thus inequalities due to progressive inflation, changing neighborhood fortunes and perhaps other causes, were perpetuated . . . . In describing how they valued new construction, the assessors expressly eschewed any conception of the value of the properties." *In re Appeals of Kents,* supra, 29. The holding in *Kents* is expressly conditioned upon the "irrational and arbitrary" assessments which existed. "Where, as here, the record of sales indicates there is no common level for all or any class of real property and the assessors disavow any effort to achieve one, the average ratio should be deemed sufficient evidence of the level to which reduction should be granted . . . ." *In re Appeals of Kents,* supra, 31. It is important to note that the *Kents* court found that a virtue of the average ratio remedy was that "it may well quicken the official conscience and induce the district to revalue and to keep the rolls current . . . . [T]he vice of unequal treatment will persist so long as the assessor fails to do his job." *In re Appeals of Kents,* supra, 32, 33; see also *Baldwin Construction Co.* v. *Essex County Board of Taxation,* 16 N.J. 329, 108 A.2d 598 (1954) (Discriminatory taxation found to violate constitutional principle where increases in certain assessments were made according to arbitrarily fixed geographical boundaries having no relation to value). This case again involved the failure of New Jersey authorities to revalue at any time, described by the court as "[t]he administrative breakdown in the enforcement by the taxing authorities of the constitutional and statutory standard of true value . . . as required by the statutes . . . ." *Baldwin Construction Co.* v. *Essex County Board of Taxation,* supra, 352 (Vanderbilt, C. J., dissenting). Should a Connecticut assessor similarly fail to follow the statutory mandate, the average ratio approach would be an approved remedy.

The claim in regard to the average ratio remedy fails along with the remedy itself, as stated in Part I. The average ratio information introduced by the plaintiffs failed to prove that the assessment procedure was not in strict conformance with the statutory requirements. Therefore we need not consider this claim as it relates to the average ratio analysis.

The second prong of this claim, that the assessment is so grossly disproportionate that it could not have been arrived at except by disregarding the statutory provisions, is foreclosed by our decision in *Uniroyal I*. In *Uniroyal I,* the plaintiffs made the same claim with regard to the assessments for the years October 1, 1973, and October 1, 1974. In this case the plaintiffs make the identical claim with regard to the years 1975, 1976 and 1977. The assessment for the years 1973–1977 were identical.

In *Uniroyal I,* this court determined that a full value of $32,959,760 was a fair and proper valuation for the October 1, 1973 and October 1, 1974 grand lists. The 1971 revaluation in Middlebury is valid for a period of ten years. General Statutes § 12-62. The annual grand list for every year since October 1, 1971, has been composed on the basis of 1971 values. The litigation of the 1973 and 1974 listings determined that the 1971 valuation of $32,959,760 was proper. The issue decided in *Uniroyal I* is thus dispositive of the plaintiffs' claim.[8] The earlier decision bars the plaintiffs' claim that the valuation established for 1971 is improper. The fact that this

[8] We also note that the plaintiffs' burden in such a case is a difficult one. "[P]roper deference must be given to the judgment and experience of assessors." *Connecticut Coke Co.* v. *New Haven,* 169 Conn. 663, 668, 364 A.2d 178 (1975). "The law contemplates that a wide discretion is to be accorded to assessors, and unless their action is discriminatory or so unreasonable that property is

valuation has been applied to successive grand lists does not permit a different result. Consideration of the contrary result demonstrates the inefficacy of permitting a litigant to contest the validity of an assessment figure on ten different occasions (i.e., each of the ten years permitted by General Statutes § 12-62). The *Uniroyal I* decision is conclusive as to the question of whether the value established was a fair 1971 value. Its application to subsequent years (as permitted by General Statutes § 12-62) does not permit relitigation of issues previously decided.[9]

There is no error.

In this opinion the other judges concurred.

---

substantially overvalued and thus injustice and illegality result, their opinion and judgment should control in the determination of value for taxation purposes." *Federated Department Stores, Inc.* v. *Board of Tax Review,* 162 Conn. 77, 86, 291 A.2d 715 (1971), quoting *Burritt Mutual Savings Bank* v. *New Britain,* 146 Conn. 669, 675, 154 A.2d 608 (1959); see also *Somers* v. *Meriden,* 119 Conn. 5, 13, 174 A. 184 (1934).

[9] "Since we deal here with tax assessments for different tax years, we are not directly concerned with res judicata but instead with that branch of the doctrine known as collateral estoppel." *Pepin* v. *Danbury,* 171 Conn. 74, 79, 368 A.2d 88 (1976). "Collateral estoppel 'is that aspect of res judicata which is concerned with the effect of a final judgment on the subsequent litigation of a different cause of action involving some of the issues determined in a former action between the parties.'" *Connecticut Light & Power Co.* v. *Tax Commissioner,* 169 Conn. 58, 62, 362 A.2d 958 (1975), quoting *Brockett* v. *Jensen,* 154 Conn. 328, 337, 225 A.2d 190 (1966). "'[A] prior judgment between the parties has been held to operate as an estoppel in a suit on a cause of action different from that forming the basis for the original suit "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." . . .' *Partmar Corporation* v. *Paramount Pictures Theatres Corporation,* 347 U.S. 89, 90, 74 S. Ct. 414, 98 L. Ed. 532 [1954]." *Connecticut Light & Power Co.* v. *Tax Commissioner,* supra, 62, quoting *Brockett* v. *Jensen,* supra, 338.