RALSTON PURINA COMPANY ET AL. *v.* BOARD OF TAX REVIEW OF THE TOWN OF FRANKLIN (12782)

SWISS-AMERICAN SPAWN, INC. *v.* BOARD OF TAX REVIEW OF THE TOWN OF FRANKLIN (12783)

PETERS, C. J., HEALEY, SHEA, HULL and L. DORSEY, Js.

Argued March 5—decision released May 5, 1987

*Palmer A. McGee, Jr.,* with whom was *J. Rene Frechette,* for the appellant (defendant in both cases).

*Milton L. Jacobson,* with whom was *Karen K. Lamb,* for the appellees (plaintiffs in each case).

PETERS, C. J. The dispositive issue in this combined appeal is whether a municipality is required under General Statutes § 12-62[1] to adjust property tax assessments during interim years between decennial revaluations of real property to account for fluctuations in property values resulting solely from changes in market conditions. The plaintiffs in the first case, Ralston Purina Company (Ralston Purina) and Franklin Mushroom Farms, Inc. (Franklin Mushroom), and the plaintiff in

---

[1] General Statutes § 12-62 provides in relevant part: "PERIODIC REVALU-ATION OF REAL ESTATE. (a) Commencing October 1, 1978, the assessors of all towns, consolidated towns and cities and consolidated towns and boroughs shall, no later than ten years following the last preceding revaluation of all real property and every ten years after each such revaluation, view all of the real estate of their respective municipalities, and shall revalue the same for assessment and, in the performance of these duties, except in any municipality where there is a single assessor, at least two of the assessors shall act together, and all valuations shall be separately approved by a majority of the assessors."

the second case, Swiss-American Spawn, Inc. (Swiss-American), appealed separately to the Superior Court pursuant to General Statutes § 12-118 from the refusal of the defendant, the board of tax review of the town of Franklin (board), to reduce the October 1, 1982 tax assessments on their real property and personal property located in that town.[2] In challenging the defendant's refusal to adjust their tax assessments, the plaintiffs claimed that the fair market value of their property had declined substantially since the last decennial revaluation conducted by the town on October 1, 1979, as evidenced by the subsequent sale of the property in 1983 at a price significantly below its assessed value. Since

---

[2] General Statutes § 12-118 provides in relevant part: "APPEAL FROM BOARD OF TAX REVIEW. Any person, including any lessee of real property whose lease has been recorded as provided in section 47-19 and who is bound under the terms of his lease to pay real property taxes, claiming to be aggrieved by the action of the board of tax review in any town or city may, within two months from the time of such action, make application, in the nature of an appeal therefrom, to the superior court for the judicial district in which such town or city is situated, which shall be accompanied by a citation to such town or city to appear before said court. . . . The court shall have power to grant such relief as to justice and equity appertains, upon such terms and in such manner and form as appear equitable, and, if the application appears to have been made without probable cause, may tax double or triple costs, as the case appears to demand; and, upon all such applications, costs may be taxed at the discretion of the court. If the assessment made by the board of tax review is reduced by said court, the applicant shall be reimbursed by the town or city for any overpayment of taxes, together with interest and costs, or, at the applicant's option, shall be granted a tax credit for such overpayment, interest and costs. Upon motion, said court shall, in event of such overpayment, enter judgment in favor of such applicant and against such city or town for the whole amount of such overpayment, together with interest and costs. The amount to which the assessment is so reduced shall be the assessed value of such property on the grand lists for succeeding years until the tax assessor finds that the value of the applicant's property has increased or decreased."

By amendments to the complaints in each case, the appeals were extended to include the October 1, 1983 and October 1, 1984 assessment dates. The plaintiff Ralston Purina Company had filed in the Superior Court a motion requesting that Franklin Mushroom Farms, Inc., be made a party plaintiff in that appeal. The trial court, *Goldberg, J.,* granted that motion on October 25, 1983.

1979, however, the assessments of their property had not been changed to reflect that decline in its fair market value. The plaintiffs therefore requested that their assessments be reduced and that the town's grand list be amended accordingly. After a joint trial of the two appeals, the trial court, *Hendel, J.,* sustained the appeals of the plaintiffs in both cases and ordered a reduction in the assessed value of their respective properties. The defendant then filed in this court separate appeals from those judgments. We find error in the ruling by the trial court that the defendant is required, as a matter of law, to adjust the plaintiffs' tax assessments in the interim period between decennial revaluations of real property.

The record reveals the following underlying facts. In 1977, Ralston Purina acquired approximately 202 acres of land in Franklin. From 1977 to 1979, it constructed and equipped on that site a special purpose building complex designed as a mushroom farm. During that same period, Ralston Purina and Swiss-American jointly constructed and equipped a spawn production facility, located approximately one quarter of a mile from the mushroom farm and designed to produce spawn, a protein product used to grow mushrooms.[3] Ralston Purina commenced operation of the mushroom farm in 1979.

As required by General Statutes § 12-62, the assessors of the town of Franklin conducted in 1979, a ten year revaluation of all real property located in the town, and revised the town's grand list as of October 1, 1979. That grand list indicated that the Ralston Purina property was valued, as of October 1, 1979, at an actual value

[3] The complex used as a mushroom farm contained approximately 346,000 square feet and the spawn production facility contained approximately 20,856 square feet. Shortly after the completion of the spawn facility, Ralston Purina sold its one half interest in the facility to Swiss-American, which eventually closed the facility in April, 1983. The plant has not been used since that time and to date remains vacant.

of $11,836,698 and an assessed value of $8,285,689.[4] These valuations were based primarily on data submitted by Ralston Purina to the town's assessors.

Apart from some minor adjustments resulting from tax benefits authorized by statute, additions to the mushroom farm complex, and the depreciation of personal property, both the actual value and the assessed value of the Ralston Purina property remained the same on the October 1, 1980, 1981, 1982, 1983 and 1984 grand lists. Neither Ralston Purina nor Swiss-American,

---

[4] The property was assessed as of October 1, 1979, at 70 percent of its actual value, which is the uniform percentage applied throughout the town in determining the assessed value of property. See General Statutes §§ 12-63 and 12-64. Due to an error in the calculation of Ralston Purina's construction costs, however, the property was in fact assessed at 51 percent of its actual value.

The actual values and assessed values of the Ralston Purina property during the relevant tax years are as follows:

|  | "1979 | | 1980 | |
|  | Actual Value | Assessed Value | Actual Value | Assessed Value |
|---|---|---|---|---|
| Land | $ 343,300 | $ 240,310 | $ 233,335 | $ 163,335 |
| Main Building | 5,599,857 | 3,919,900 | 5,613,640 | 3,929,548 |
| Improvements | 699,127 | 489,389 | 610,892 | 427,625 |
| Personal Property Not Including Trays* | 5,194,414 | 3,636,090 | 4,487,910 | 3,141,537 |
| Trays* |  |  |  |  |
| TOTALS | $11,836,698 | $8,285,689 | $10,945,777 | $7,662,045 |

|  | 1981 | | 1982 | |
|  | Actual Value | Assessed Value | Actual Value | Assessed Value |
|---|---|---|---|---|
| Land | $ 233,335 | $ 163,335 | $ 233,335 | $ 163,335 |
| Main Building | 5,613,640 | 3,929,548 | 5,613,640 | 3,929,548 |
| Improvements | 610,892 | 427,625 | 610,892 | 427,625 |
| Personal Property Not Including Trays* | 3,589,574 | 2,512,702 | 3,070,660 | 2,149,462 |
| Trays | 736,292 | 515,405 | 619,229 | 433,460 |
| TOTALS | $10,783,733 | $7,548,615 | $10,147,756 | $7,103,430 |

* Actual and assessed values of personal property for 1979 and 1980 include value of trays "

however, has ever challenged the valuation of their respective properties as of the October 1, 1979, 1980 and 1981 assessment dates.[5] Thus, the plaintiffs in these appeals challenge only their tax assessments on October 1, 1982, 1983 and 1984.

Due to increased competition from out-of-state mushroom growers, Ralston Purina faced mounting losses in its mushroom business in 1981 and 1982, and decided in 1982 to sell the Franklin mushroom farm. Shortly after announcing publicly its intention to sell the mushroom business, Ralston Purina received and accepted an offer of $2 million from a group of local investors. Those investors subsequently organized Franklin Mushroom Farms, Inc., a plaintiff in this appeal. The sale was completed on February 9, 1983, when Ralston Purina conveyed to Franklin Mushroom the real estate for $1,265,000 and the farm machinery for $435,000.[6]

---

[5] The assessors of the town of Franklin valued the mushroom farm properties as of October 1, 1982, at an actual value of $10,147,755 and an assessed value of $7,103,430. They valued the spawn facility as of that date at an actual value of $1,193,890 and an assessed value of $835,735. After Swiss-American ceased operations at the facility in April, 1983, the assessors reduced the actual value of the spawn facility as of October 1, 1983, to $975,600 and the assessed value to $682,925. The assessors further reduced the value of the spawn facility personal property as of October 1, 1984, to an actual value of $357,690 and an assessed value of $250,360.

We note that Swiss-American made no claim, either in its written brief or at oral argument before this court, that the cessation of operations at the spawn facility in 1983 constituted a substantial change in use requiring that the property be reassessed for tax purposes. We therefore need not address in this appeal the issue of whether such a change in the use of property would require the assessor of a town to conduct an interim revaluation of the property.

[6] The record contains a discrepancy as to the actual purchase price of the property. In denying the defendant's motion for summary judgment, the trial court, *Vasington, J.*, found that on February 9, 1983, Ralston Purina conveyed to Franklin Mushroom the real estate for $1,265,000 and farm machinery for $435,000. Subsequently, the trial court, *Hendel, J.*, found that Ralston Purina had accepted Franklin Mushroom's offer of $2 million to purchase the assets of the mushroom farm. For purposes of these appeals, we will assume that the Ralston Purina property was sold for $2 million.

Upon conveyance of the real estate, Franklin Mushroom assumed and agreed to pay the taxes assessed on the property.

The plaintiffs filed with the defendant two separate petitions for correction of the assessed value of their respective properties as of October 1, 1982. Furthermore, Ralston Purina and Franklin Mushroom appeared before the defendant and claimed that, for assessment purposes, the fair market value of the mushroom farm should have been reduced to the purchase price paid by Franklin Mushroom for the property in February, 1983. The board denied both petitions, and the plaintiffs appealed to the Superior Court pursuant to General Statutes § 12-118.

In response to the appeal of the plaintiffs Ralston Purina and Franklin Mushroom, the defendant moved for summary judgment, alleging that there was no genuine issue of material fact, and that, as a matter of law, the plaintiffs were bound by the assessments of their property as of the 1979 decennial revaluation. The plaintiffs responded that the assessments on their real and personal property were excessive and did not reflect the "true market value" of that property on October 1, 1982, and October 1, 1983. The trial court, *Vasington, J.,* denied that motion, relying upon General Statutes § 12-63, which provides in part that "[t]he present true and actual value of all other property shall be deemed by all assessors and boards of tax review to be the fair market value . . . ." The court concluded, therefore, that there was a genuine issue of material fact as to the "present and true actual value of the plaintiff's property" on the assessment dates in question and that the issue could only be resolved at trial.

Shortly thereafter, the trial court, *Hendel, J.,* tried the two appeals together. In its memorandum of deci-

sion, the court did not discuss whether the plaintiffs in either case were actually entitled to an interim adjustment of their property assessments, adopting the implicit conclusion of the trial court, *Vasington, J.,* that the defendant was in fact obligated to make the requested adjustments.[7] The court focused instead on selecting and applying the appropriate methods for valuation of the plaintiffs' property. In the appeal by Ralston Purina and Franklin Mushroom, the court found that the mushroom farm operation had been unsuccessful since its inception, principally because of "the influx of fresh mushrooms into the northeastern United States Market area from numerous small mushroom growers located in Pennsylvania." The court further determined that Ralston Purina's decision to sell the farm was a "normal business decision to divest an unprofitable operation made in the ordinary course of business," and that it had not acted "under compulsion" in accepting the $2 million offer by the organizers of Franklin Mushroom, even though it had earlier attempted to sell the mushroom facility for $4 million. Applying the sales comparison valuation method, the court concluded that the actual value of the Ralston Purina property was $3 million and its assessed value was $2,100,000 as of October 1, 1982, 1983 and 1984.[8] In the second appeal, the court determined that it was appropriate to value the spawn production facility at "its cost less physical, functional and economic depreciation and obsolescence," and concluded that the actual value of the property was $255,000 and its assessed value was $178,500, as of October 1, 1982, 1983 and

---

[7] On the first day of trial, the defendant moved orally for a finding that the plaintiffs in both cases were not aggrieved. See General Statutes § 12-118. The trial court, *Hendel, J.,* orally denied that motion on the ground that the prior ruling of the trial court, *Vasington, J.,* denying the defendant's motion for summary judgment constituted the law of the case.

[8] These figures reflect the combined value of the land, buildings and improvements, and personal property.

1984.[9] The court therefore rendered judgment for the plaintiffs in both cases and ordered the defendant to adjust their tax assessments accordingly.

On appeal from these judgments, the defendant contends that: (1) as a matter of law, it is not obligated to reduce the tax assessments of the mushroom farm or the spawn production facility in the interim years between decennial revaluations simply because that property declined in value as a result of changes in market conditions in the mushroom industry; (2) it likewise is not required to reduce the tax assessment of the mushroom farm merely because that property was sold in 1983 at a price below its assessed value as of the 1979 decennial revaluation; (3) the trial court improperly relied on Ralston Purina's sale of the mushroom farm in determining the value of that property; and (4) the trial court erred in refusing to admit into evidence Ralston Purina's answers to the defendant's interrogatories. We will address jointly the defendant's first two claims of error. Because we resolve those claims in favor of the defendant, we need not address its third and fourth claims.

In its first two claims of error, the defendant essentially argues that as a matter of law, under General Statutes § 12-62, it is not obligated to adjust the plaintiffs' property tax assessments during interim years between decennial revaluations of real property to account for fluctuations in property values resulting solely from changes in market conditions in the mushroom industry. According to the defendant, it may be required to conduct such interim revaluations of real property in certain limited circumstances, but this case does not present such circumstances. We agree.

[9] These figures reflect the combined value of the land, and buildings and improvements. The trial court did not adjust the value of the personal property because Swiss-American offered no evidence at trial regarding the value of that property.

As noted above, the plaintiffs have brought this appeal under § 12-118, which conditions relief upon proof of failure to comply with § 12-64.[10] *Uniroyal, Inc.* v. *Board of Tax Review,* 182 Conn. 619, 627, 438 A.2d 782 (1981); *Kays, Inc.* v. *Board of Tax Review,* 170 Conn. 477, 481, 365 A.2d 1207 (1976); *Lerner Shops of Connecticut, Inc.* v. *Waterbury,* 151 Conn. 79, 86, 193 A.2d 472 (1963). Section 12-64, which establishes the procedure for taxation of real property in Connecticut, provides that all nonexempt real estate "shall be liable to taxation at a uniform percentage of its present true and actual valuation . . . to be determined by the assessors." It then sets forth a three step procedure for carrying out the statute's mandate: "(a) The fair value of property as of the assessment date must be determined. (b) A percent, not exceeding 100 percent, of the fair value, must be determined by the assessing authority for uniform application to all property within the town. (c) The assessment value, i.e., the value for the purpose of taxation, for any given piece of property in the town, must be ascertained by applying the determined uniform percent to its fair value as of the assessment date." *Lerner Shops of Connecticut, Inc.* v. *Waterbury,* supra, 85; General Statutes § 12-64; *Uniroyal, Inc.* v. *Board of Tax Review,* supra, 623.[11] In the present case, the plaintiffs allege that the

---

[10] General Statutes § 12-64 provides in relevant part: "REAL ESTATE LIABLE TO TAXATION. EASEMENTS IN AIR SPACE. SEPARATE ASSESSMENT OF THE INTEREST OF A LESSEE. CONDITIONS UNDER WHICH LESSEE OF STATE-OWNED PROPERTY IS SUBJECT TO TAX. (a) All the following-mentioned property, not exempted, shall be set in the list of the town where it is situated and, except as otherwise provided by law, shall be liable to taxation at a uniform percentage of its present true and actual valuation, not exceeding one hundred per cent of such valuations, to be determined by the assessors . . . ."

[11] For purposes of assessing the value of property, the terms actual valuation, market value, actual value, fair market value, market price and fair value are synonymous. *Uniroyal, Inc.* v. *Board of Tax Review,* 182 Conn. 619, 623 n.3, 438 A.2d 782 (1981); *Bridgeport Gas Co.* v. *Stratford,* 153 Conn. 333, 335, 216 A.2d 439 (1966).

defendant failed to comply with § 12-64 in that the defendant assessed their property on October 1, 1982, 1983 and 1984 on the basis of its fair market value as of 1979, rather than assessing it on the basis of its fair market value on those particular assessment dates. The plaintiffs contend that they are therefore entitled, under both statutory law and recent case law, to an interim adjustment of their assessments for the tax years in question.

The defendant resolutely denies that the plaintiffs are entitled to such an adjustment, relying principally upon the language of § 12-62, and this court's interpretation of that statute in *Uniroyal, Inc.* v. *Board of Tax Review,* supra (*Uniroyal II*). See also *Uniroyal, Inc.* v. *Board of Tax Review,* 174 Conn. 380, 389 A.2d 734 (1978) (*Uniroyal I*). General Statutes § 12-62 (a) provides in part that "[c]ommencing October 1, 1978, the assessors of all towns, consolidated towns and cities and consolidated towns and boroughs shall, no later than ten years following the last preceding revaluation of all real property and every ten years after such revaluation, view all of the real estate of their respective municipalities, and shall revalue the same for assessment . . . . " The defendant argues that, in light of the municipality's obligation to revalue property only once every ten years pursuant to § 12-62, the "present and actual value" of the plaintiffs' property for assessment purposes is its actual value as of the town's 1979 decennial revaluation, regardless of any subsequent fluctuations in its fair market value due to economic changes in the mushroom industry. *Uniroyal II,* supra, 629; see General Statutes § 12-64; *O'Brien* v. *Board of Tax Review,* 169 Conn. 129, 136, 362 A.2d 914 (1975); *Schnier* v. *Ives,* 162 Conn. 171, 177, 293 A.2d 1 (1972); *Somers* v. *Meriden,* 119 Conn. 5, 13, 174 A. 184 (1934). Furthermore, although the defendant concedes that, under certain circumstances, such as the

destruction or expansion of property, a substantial change in its use or zoning classification, or a decision by the taxpayer to go out of business, it would be required to conduct an interim revaluation of property, it contends that none of those circumstances exists in the present case.

The plaintiffs argue, on the other hand, that § 12-62, by its express terms, requires the revaluation of real property at least once every ten years, but in no way precludes further revaluation during interim years in circumstances such as those presented here. In support of this argument, the plaintiffs place great emphasis upon the express language of § 12-64, which provides that all nonexempt real property shall be taxed at its "present true and actual valuation." The "present and true actual value" of property is defined in § 12-63 as the "fair market value thereof and not its value at a forced or auction sale."[12] Under the plaintiffs' interpretation of these statutes, the "present true and actual" value of their property, on which their tax assessments should have been based, is the price at which the Ralston Purina property was sold in February, 1983. The plaintiffs further contend that the defendant is not merely authorized, but is in fact required to adjust their assessments pursuant to § 12-55, which states in part that "assessors may increase or decrease the valuation of property as named

---

[12] "[General Statutes] Sec. 12-63. RULE OF VALUATION. The present true and actual value of land classified as farm land pursuant to section 12-107c, as forest land pursuant to section 12-107d, or as open space land pursuant to section 12-107e shall be based upon its current use without regard to neighborhood land use of a more intensive nature, provided in no event shall the present true and actual value of open space land be less than it would be if such open space land comprised a part of a tract or tracts of land classified as farm land pursuant to section 12-107c. The present true and actual value of all other property shall be deemed by all assessors and boards of tax review to be the fair market value thereof and not its value at a forced or auction sale."

in . . . the last-preceding grand list.''[13] Although § 12-55 appears to be permissive, rather than mandatory, the plaintiffs maintain that, read in context with §§ 12-62 through 12-64, it actually mandates that municipal assessors value property based upon its fair market value during the tax year in question, not as of the last decennial revaluation.

Concededly, none of these statutes that establish procedures for valuing and assessing property expressly addresses the issue of whether assessors are required to conduct interim revaluations of property to account for the effect of changes in market conditions. The plaintiffs' reading of the statutes, standing alone, is therefore as plausible as the defendant's interpretation. As the defendant correctly points out, however, the plaintiffs' argument directly contradicts our interpretation of § 12-62 in *Uniroyal II.*

We held in *Uniroyal II* that the decennial revaluation of real property mandated by § 12-62 is the exclusive remedy provided by the legislature "for variations in the effect of market conditions on different parcels . . . ."[14] *Uniroyal II,* supra, 629. Indeed, the proce-

---

[13] General Statutes § 12-55 provides in relevant part: "LISTS; NOTICE OF INCREASE; PUBLIC INSPECTION; ABSTRACTS. When the lists of any town have been so received or made by the assessors, they shall equalize the same, if necessary, and make any assessment omitted by mistake or required by law. The assessors may increase or decrease the valuation of property as named in any of such lists or in the last-preceding grand list, but, in each case of any increase in valuation of such property above the valuation, if any, stated by the person filing such list or in each case of any increase of valuation above the valuation of such property in the last-preceding grand list, they shall send written notice by mail of such increase, including in such notice the valuation prior to and after such increase with respect to each parcel of real property or any improvement thereon, the valuation of which has been increased, to the last-known address of the person whose list or valuation is so changed."

[14] A professional manual containing guidelines for tax assessors states that the purpose of the decennial revaluation is "to secure a more equitable distribution of the tax burden, to bring the assessment level up-to-date,

dure established in § 12-62 reflects the legislative judgment that the remedy of revaluation "need only be available once each decade," rather than any time property values fluctuate in response to market conditions. *Uniroyal II,* supra; see *Kays, Inc.* v. *Board of Tax Review,* supra, 480; *Bassett* v. *Rose,* 141 Conn. 129, 134–35, 104 A.2d 212 (1954). The plaintiffs' reliance upon § 12-64 is therefore misplaced because § 12-64, in contrast to § 12-62, "is concerned with the manner of taxation, not the frequency of valuation, and it does not purport to require assessors to be updated on their valuations at all times." *Kays, Inc.* v. *Board of Tax Review,* supra; *Uniroyal II,* supra, 629.

The legislature is vested with broad powers of taxation and may prescribe the conditions and methods of assessment, levy and collection of taxes. *Uniroyal II,* supra, 626; *Bassett* v. *Rose,* supra, 133–34. In our view, the legislature properly exercised that power in enacting § 12-62, which is based upon the legislature's awareness that, even though property values may fluctuate within a ten year period, it is neither realistic nor necessarily desirable to require more frequent property revaluations.[15] *Uniroyal II,* supra, 629–30; *Kays, Inc.* v. *Board of Tax Review,* supra. The legislature thus deliberately fashioned an assessment scheme designed to require assessors to base property valuations upon

and to modernize assessment procedures." Handbook for Connecticut Assessors (Connecticut Association of Assessing Officers, Office of Policy and Management of the State of Connecticut and Institute of Public Service of the University of Connecticut, 1984 Ed.) p. 84. Although this statement of purpose is in no way binding upon us, it does indicate that decennial revaluation figures might well become outdated during the interim period, but that necessary adjustments will be made only once every ten years.

[15] We note that an argument could be made that general revaluations of property should be conducted more often than once every ten years. It is within the prerogative of the legislature, however, to determine the optimal frequency of such revaluations. *Uniroyal, Inc.* v. *Board of Tax Review,* 182 Conn. 619, 629, 438 A.2d 782 (1981); *Bassett* v. *Rose,* 141 Conn. 129, 135, 104 A.2d 212 (1954).

more reliable, long term market trends: "Tax asses-
sors are required to recognize and act on the principle
that the true value of a fixed asset such as real estate
is fairly constant and must be gauged, not by condi-
tions temporary and extraordinary, but by those
prevailing over a period of time, and the assessors, in
listing values of property for taxation, may, to a cer-
tain extent, disregard excesses of a boom as well as
the despair of a depression. *Alfred J. Sweet, Inc.* v.
*Auburn,* 134 Me. 28, 32, 180 A. 803 [1935]." *Burritt
Mutual Savings Bank* v. *New Britain,* 146 Conn. 669,
677–78, 154 A.2d 608 (1959); *Uniroyal II,* supra, 628.

Unless the plaintiffs can provide a convincing ration-
ale for our departure from the interpretation of § 12-62
in *Uniroyal II,* we are bound by that interpretation.
*O'Connor* v. *O'Connor,* 201 Conn. 632, 639, 519 A.2d
13 (1986); *State* v. *Castonguay,* 194 Conn. 416, 435, 481
A.2d 56 (1984); *Herald Publishing Co.* v. *Bill,* 142 Conn.
53, 62, 111 A.2d 4 (1955). On the present record, we
are not persuaded of the need to reexamine our inter-
pretation of § 12-62 as mandating general revaluations
of real property only once every decade. *Uniroyal II,*
supra, 629. To the contrary, we presume that the legis-
lature is aware of our interpretation of a statute, and
that its subsequent nonaction may be understood as a
validation of that interpretation. *Herald Publishing Co.*
v. *Bill,* supra, 63; *Forman Schools, Inc.* v. *Litchfield,*
134 Conn. 1, 6, 54 A.2d 710 (1947); *Cashman* v.
*McTernan School, Inc.,* 130 Conn. 401, 408, 34 A.2d
874 (1943); *Coombs* v. *Darling,* 116 Conn. 643, 646, 166
A. 70 (1933). Since the legislature has not amended
§ 12-62 subsequent to our decision in *Uniroyal II,* we
can discern no reason now to amend that statute judi-
cially so as to alter the apparent intent of its drafters
to preclude, as a general rule, interim revaluations of
real property. *Burwell* v. *Board of Selectmen,* 178 Conn.
509, 518, 423 A.2d 156 (1979); *Dental Commission* v.

*Tru-Fit Plastics, Inc.,* 159 Conn. 362, 365, 269 A.2d 265 (1970); *Herald Publishing Co.* v. *Bill,* supra; *State* v. *Nelson,* 126 Conn. 412, 418, 11 A.2d 856 (1940).

The plaintiffs do not mount a frontal attack on *Uniroyal II* but instead attempt to distinguish it. The plaintiffs in *Uniroyal II* sought an interim adjustment of their tax assessments because they were allegedly bearing a disproportionately high burden of the taxes in their municipality. *Uniroyal II,* supra, 623. By contrast, the plaintiffs here do not allege that they have been forced to bear a disproportionate tax burden, but claim only that the fair market value of their property has declined in the interim period between decennial revaluations. In the context of this case, however, this distinction has no significance. Although the plaintiffs here rely upon different grounds in challenging their tax assessments, they seek the same relief requested by the plaintiffs and denied by this court in *Uniroyal II,* an interim revaluation of their property. As we concluded in *Uniroyal II,* supra, 629, the legislature, in § 12-62, has precluded such interim revaluations except in unusual circumstances, which did not exist in that case and likewise do not exist here. The plaintiffs presently before us are therefore no more entitled to an interim adjustment of their tax assessments than were the plaintiffs in *Uniroyal II.*

The principal basis for the plaintiffs' claim that they are entitled to an interim reduction in their tax assessments is that dramatic economic changes in the mushroom industry have caused the fair market value of their property to decline since 1979.[16] Specifically, the

---

[16] The plaintiffs argue, secondarily, that the mushroom farm and the spawn facility are single purpose properties, specially designed and constructed for growing mushrooms, and located in a district zoned for residential use. Since these facilities cannot readily be converted for use in other industries, the value of the property is inextricably tied to the economic viability of the mushroom industry. In the plaintiffs' view, this fact fur-

trial court found that these changes in market conditions were initially triggered by an increase in imports of canned mushrooms and processed mushrooms from the Far East, which, in turn, caused a decline in the demand for fresh mushrooms produced by Pennsylvania mushroom growers. Consequently, Pennsylvania mushroom growers shipped their fresh mushrooms into the market previously served by the Franklin Mushroom farm. According to the trial court, these circumstances contributed, in large part, to the unprofitability of the mushroom farm and ultimately led to Ralston Purina's decision to sell the farm in 1982. The farm was then sold in 1983 for $2 million, a figure well below its assessed value of $7,103,430. Despite the plaintiffs' claims to the contrary, however, this apparent variation between the 1979 fair market value of the property and its fair market value during the tax years in question, attributable solely to changes in market conditions, is a "permissible variation under the legislative scheme for assessment." *Uniroyal II,* supra. Under the circumstances of this case, therefore, the defendant is not obligated to conduct an interim revaluation of the plaintiffs' property.[17] Rather, in light of our holding in *Uniroyal II,* the only remedy available to the plaintiffs is that provided by the legislature in § 12-62, the general revaluation of real property required only once every decade.

There is error, the judgments of the trial court are set aside and the cases are remanded with direction to render judgments for the defendant in both cases.

ther entitles them to an interim adjustment of their tax assessments. The plaintiffs offer no authority, however, for the proposition that the limited versatility and marketability of property has any bearing on a taxpayer's right to such an interim adjustment.

[17] The plaintiffs made no claim that these cases present the special circumstances described by the defendant as requiring an interim revaluation of property.

In this opinion HEALEY, HULL and L. DORSEY, Js., concurred.

SHEA, J., dissenting. I disagree with the conclusion reached by the majority that the mandate of General Statutes § 12-64 that property "shall be liable to taxation at a uniform percentage of its *present* true and actual valuation" (emphasis added) must be satisfied only once in ten years, when the decennial revaluation for all real estate within a town required by General Statutes § 12-62 occurs. The provision of General Statutes § 12-55 that the assessors "shall equalize" the annually filed tax lists of a town, "if necessary," and authorizing them, in order to enable them to fulfill this duty, to "increase or decrease the valuation of property as named in any of such lists or in the last-preceding grand list" would serve little purpose if yearly adjustments of individual property values were not contemplated when special circumstances pertaining only to one property result in a substantial change in its value.

The majority opinion does not dispute the finding of the trial court, *Hendel, J.,* that the plaintiff's property suffered a decline in value from $11,836,698 in 1979 to $3,000,000 in 1982. This reduction of more than two-thirds resulted from circumstances uniquely concerning the plaintiffs' property and not affecting other property in the town. The duty imposed by § 12-55 on the assessors to "equalize" assessments on the grand list was, therefore, activated for the tax years 1982 through 1984 and required a corresponding reduction in the assessment of the plaintiffs' property. A similar duty to "equalize and adjust the valuations and assessment lists" was imposed upon the defendant board of tax review by General Statutes § 12-111.

The statutorily mandated duty to equalize assessments, of course, is not invoked where economic conditions, such as a widespread depression or inflation,

have resulted in an increase or decrease in value of substantially all properties within a town. General fluctuations in property values have no disparate impact upon individual taxpayers because they result in assessment deviations from "present true and actual value" that affect all properties alike. Under such circumstances the proportion of the tax burden borne by each taxpayer remains the same.

In *Uniroyal, Inc.* v. *Board of Tax Review*, 182 Conn. 619, 627–28, 438 A.2d 782 (1981), upon which the majority opinion primarily relies as justification for ignoring the statutory criterion of "present true and actual value" as the basis for assessments, this court was concerned with the effect upon property values of the inflation that had occurred since the preceding revaluation date. The proper conclusion was reached that such a condition presented no occasion for adjustment of the assessment of any individual taxpayer because no disproportionate tax burden could follow from a general increase in property values within a town. Id., 628–29. The reference in *Uniroyal* to the "excesses of a boom as well as the despair of a depression," in addition to the factual context of the case, make it clear that the court was considering only such general market conditions in the remark relied upon by the majority that "the remedy for variations in the effect of market conditions on different parcels is set forth in General Statutes § 12-62," decennial revaluation. In my view, therefore, *Uniroyal* is not decisive of the question before us of whether a substantial decline in the value of one property resulting from market conditions or other forces not affecting other properties warrants an assessment adjustment pursuant to the duty to equalize values on the grand list imposed on the assessors by § 12-55 and on the defendant board by § 12-111.

As the majority opinion notes, the defendant board of tax review has conceded that certain circumstances, "such as the destruction or expansion of property, a substantial change in the use or zoning classification, or a decision by the taxpayer to go out of business," would require an interim revaluation of the affected property. It is difficult to comprehend why a decline in the market for a product, which, as in the present case, may have an equally severe impact upon the value of the property used in its production, should be excluded from this list of situations warranting relief. Although in this instance the taxpayer has not gone out of business, despite the disproportionate tax burden to be borne, the holding of the majority that a substantial decline in the value of a taxpayer's property resulting from market conditions affecting a single industry justifies a tax adjustment only at ten year intervals is likely to be a significant factor in making such a decision.

"Any circumstances indicating that a disproportionate share of the tax burden is being thrust upon a taxpayer would warrant judicial intervention." *Chamber of Commerce of Greater Waterbury, Inc.* v. *Waterbury*, 184 Conn. 333, 336, 439 A.2d 1047 (1981). Because a substantial decline in the value of the property of one taxpayer that does not affect others, whether occasioned by market conditions or other forces, must inevitably result in his bearing a disproportionate share of the tax burden, I conclude that the duty to equalize assessments imposed by § 12-55 required the reduction in the plaintiffs' assessments ordered by the trial court and that the judgment should be affirmed.