[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
These actions are municipal tax appeals wherein the plaintiff, Hallmark Cards, Inc. (Hallmark) challenges the valuation of two parcels of real estate known as Lot 14, Manning Road, and Lot 15, Manning Road, in the town of Enfield. These two appeals are from the Enfield assessor's valuation of real property for the grand lists of October 1, 1993, 1994, 1995, and 1996. These appeals were taken from the board of tax review's denial of Hallmark's claim that the real estate it owns and leases in Enfield was excessively valued for the grand list of October 1, 1993, and subsequent years.
The court finds following facts. Hallmark owns an industrial warehouse in Enfield known as 53 Manning Road, also known as Lot 15. Lot 15 contains 15.14 acres of land. A building containing 377,337 square feet is located on Lot 15. The building was built CT Page 4730 in stages: a one-story warehouse was built in 1961, and a two-story warehouse was built in 1967 with additions in 1972 and 1975. The one-story portion of the building contains the order-filling department of Hallmark, office space, a cafeteria, and an employee store. The first story of the warehouse on Lot 15 has a clear ceiling height of 10 feet; the second story has a clear ceiling height of 14 feet. Access to the second story is provided by an earthen ramp so that the delivery or removal of inventory need not be made through the first story of the building.
The adjoining property, Lot 14, is owned by Best Realty Associates and leased to Hallmark under a long term lease. The initial lease in 1972 was for 25 years. Hallmark has exercised its option to renew the lease for an additional 10 years. Hallmark is obligated under the lease to pay the real property taxes. The leased warehouse contains 235,080 square feet of space and is located on 19 acres of land. The clear ceiling height in the leased warehouse on Lot 14 is 22 feet. The warehouse on Lot 14 is connected to the two story portion of the warehouse on Lot 15 by a connector-conveyor.
Hallmark uses the buildings on Lot 14 and 15 as a distribution center and warehouse for its inventory of greeting cards. All shipments from this distribution center come out of the owned building on Lot 15. The inventory stored in the leased warehouse is moved to the distribution center on Lot 15 through the conveyor that connects the two buildings.
On October 1, 1993, the town of Enfield undertook a town-wide revaluation of all real property. The assessor determined the fair market value of Lot 15 to be $11,300,000 and set the fair market value of Lot 14 at $6,500,000. Prior to October 1, 1993, Lot 15 was valued at $6,374,785 and Lot 14 was valued at $4,186,400. The previous town-wide revaluation was on October 1, 1983. No new construction was added to either of the properties since the 1983 revaluation.
Hallmark's appraiser, Robert Pfeifer, Jr. was of the opinion that Lot 15, the owned facility, was not being used at its highest and best use. Pfeifer concluded that the highest and best use of the building on Lot 15 was for manufacturing purposes because of the building's low ceiling heights of 10 feet on the first floor and 14 feet on the second floor. Based on a highest and best use as a manufacturing facility, Pfeifer determined that the fair market value of Lot 15 on October 1, 1993, was $3,775,000. Pfeifer CT Page 4731 concluded that the highest and best use of the leased facility on Lot 14 was for warehouse use. On this basis, Pfeifer determined that the fair market value of the leased facility was $4,100,000 as of October 1, 1993.
The town's appraiser, Robert J. Flanagan, concluded that the highest and best use as improved of both the owned facility and the leased facility was their present use as a distribution and warehouse facility. Relying primarily on the income approach, Flanagan determined that the fair market value of the owned facility on Lot 15 on October 1, 1993, was $10,974,000. Flanagan also determined that the fair market value of the leased facility on Lot 14 on October 1, 1993 was $6,500,000.
The basic issue is whether, as of October 1, 1993, the assessor's valuations placed upon the two properties comprising the Hallmark facility were excessive, and if so, what was the fair market value of each property at that time.
"Fair market value," which is the "present true and actual value," is the standard test for determining what real estate is worth. See § 12-63; Uniroyal Inc. v. Board of Tax Review,182 Conn. 619, 623 n. 3 438 A.2d 782 (1981). In order to determine whether Hallmark's properties were excessively valued, we must first determine the highest and best use of the properties. This is so because "[t]he `highest and best use' concept, chiefly employed as a starting point in estimating the value of real estate . . . has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." State NationalBank v. Planning Zoning Commission, 156 Conn. 99, 101,239 A.2d 528 (1968). See also Carol Management Corp. v. Board of TaxReview, 228 Conn. 23, 34, 633 A.2d 1368 (1993).
For our purposes, the owned property on Lot 15 and the leased property on Lot 14 are presently being used jointly as a distribution center and warehouse. The combination of the use of owner occupied land with that of leased land makes the total use a special purpose use. Real estate that is limited to only one use or a very limited number of uses is a special purpose property. The Appraisal Institute, The Appraisal of Real Estate (10th Ed. 1992), p. 293. The highest and best use of a special purpose property as improved is usually the continuation of its current use, if that use remains viable. Id. CT Page 4732
Pfeifer concluded that a manufacturing plant was the highest and best use of Lot 15. We disagree. Although functionally, the owned warehouse on Lot 15 has lower ceiling heights than are generally desirable for warehouse use, the combination of the distribution center, with use of the adjoining warehouse, which has adequate ceiling heights, makes the total use consistent with the purpose for which it is presently being used. Pfeifer would have Hallmark break up the present use into a manufacturing facility on Lot 15 and a warehouse facility on Lot 14.
In supporting its position that Lot 15, the owned property, is not suited for warehouse use, Hallmark relies on the fact that this warehouse was built with two stories and neither story has the minimum desired ceiling height of 18 feet. Hallmark also relies on its own facilities manager who described the Hallmark-owned facility as "old technology" because of the need to use a lift pallet to transport product from one floor to the next. Hallmark's dissatisfaction with the old technology of the owned facility has a hollow ring to it when we see that Hallmark has exercised its option to extend the lease of Lot 14 for an additional ten years after the expiration of the original twenty-five year lease ending in 1997.
Hallmark also relies on the physical separation of the two facilities to distinguish one for manufacturing use and the other for warehouse use. We find it difficult to conceptually separate the two uses when in fact Hallmark uses both facilities jointly as a single warehouse and distribution center and intends to continue that use for at least the next ten years.
One may speculate on types of uses, but realistically, a party owning and leasing adjoining land must use the two consistently with each other to maximize the highest and best use of the property. See The Appraisal of Real Estate, supra, p. 289. We therefore agree with Flanagan that the highest and best use of Lots 14 and 15 combined is the present use as a warehouse and distribution center.
After concluding that the highest and best use of the subject properties is continued warehouse and distribution center use, we turn to the question of whether Lots 14 and 15 were excessively valued. In considering the various methods of valuation, we find the sales comparison approach to be the best approach for determining value in this case. "The sales comparison approach has broad applicability and is persuasive when sufficient data are CT Page 4733 available." The Appraisal of Real Estate, supra, p. 369. While the use of the two subject properties together by Hallmark is complementary and unique, adequate comparable sales of warehouse and light industrial properties exist.
Although Pfeifer split the two parcels into two separate highest and best uses, he used the same comparables as to each parcel use to determine value based upon market sales. Flanagan, on the other hand, selected comparable sales of industrial uses. However, Flanagan's comparable sales were smaller in size than the subject property, ranging from 37,258 square feet of building space to 169,233 square feet.
We recognize that the plaintiff has the burden to prove its case. Midway Green Corp. v. Board of Tax Review, 8 Conn. App. 440,442, 512 A.2d 984 (1986). However, in our determination as to whether Hallmark's facilities were valued excessively by the assessor we must base our decision on a consideration of all of the competent and credible evidence presented to us in the course of the trial, whether presented by the plaintiff or defendant. See id., 443-44.
A review of all of the comparable sales introduced into evidence leads us to conclude that the subject properties have been excessively valued for the grand list of October 1, 1993. Flanagan arrived at a unit value of $29.00 per square foot for both the owned and leased property. Flanagan's range of industrial sales ran from $25.14 to $57.97 per square foot of building area including land. Pfeifer, on the other hand, determined that the unit value for the owned facility was $10.00 per square foot, and the unit value for the leased facility was $17.50 per square foot of building area including land. All of the comparables selected by Pfeifer on the owned property were adjusted downward between 25% and 75%. Pfeifer basically relied on three comparable sales in valuing both the owned and leased property of Hallmark: sales 1, 5, and 6. (April 25, 1996 Transcript pp. 91-92.) Sale 6 was a parking garage at 295 Ella T. Grasso Turnpike in Windsor Locks. Sale 6 sold on November 12, 1991, for $5,500,000 or $12.65 per square foot of building. Although sale 6 was a multitenant building of 456,542 square feet, its major use was for an airport valet parking garage. We disagree that sale 6, used for valet parking, is a credible example of a comparable sale to property having a highest and best use as a warehouse distribution center.
Pfeifer's sale 1 was purchased in June of 1994 for $1,750,000 CT Page 4734 or $11.38 per square foot of building space. The building contained 153,716 square feet of space with its highest and best use as manufacturing. The building, located in Bristol, was formerly owned by a division of Cooper Industries which conducted a regulated waste activity. Although Flanagan surmised that there was an environmental problem with the waste disposal which would affect the sale price of the land, we find no such impact. The waste was handled in compliance with the state hazardous waste management regulations. Although we find no environment impact of the sale of the Bristol comparable, the use of this property was for manufacturing purposes, not warehouse distribution uses.
The only substantive sale selected by Pfeifer that we find credible is sale 5 at 81 Chapel Road, Manchester. Sale 5 has 29.33 acres of land and contains a building with 236,192 square feet of space. This property was used as a warehouse. The Manchester property sold on September 9, 1992, for $5,900,000 or $24.98 per square foot of building space including land.
Our conclusion, after considering the comparable sales and testimony of both Pfeifer and Flanagan and our own understanding of value, is that the value of each of the subject properties is $25.00 per square foot of building including land. This translates into a finding that Lot 15 had a fair market value as of October 1, 1993, of $9,433,425. We further find that Lot 14 had a fair market value as of October 1, 1993, of $5,877,000. The assessor shall correct the assessment on Lot 15 known as 53 Manning Road, Enfield, and correct the assessment on the adjoining property, Lot 14, owned by Best Realty Associates and leased to Hallmark, based upon our findings of fair market value for the grand lists of October 1, 1993, 1994, 1995, and 1996.
Judgment is entered sustaining the plaintiff's appeals. No costs shall be taxed to either party.
Arnold W. Aronson Judge Trial Referee