[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
Memorandum Filed June 27, 1997
Each of these seven cases is a tax appeal. Each appeal claims that, briefly stated, the Somers assessment on the property that is the subject of the appeal is excessive. The following is a brief description of the property that is the subject of the appeals: (In each of the case nos., the uniform prefix "CV 94" has been omitted.)
In case No. 55821, the owners of the property are Ralph G. Burnette and Marie G. Burnette. Their property, 82 Rye Hill Circle, Somers, CT is a seven room residence located on a 2.4 acre lot. This property will be referred to hereinafter as the "Burnette property."
In case No. 55822, the owners of the property are Raymond C. Colton and Marie I. Colton. Their property, 48 Rye Hill Circle, Somers, Ct is a 5.5 room residence located on a .94 acre lot. This property will be referred to hereinafter as the "Colton property." CT Page 6690
In case No. 55824, the owners of the property are Wayne R. Hare and Marilyn Hare. Their property, 203 George Wood Road, Somers, CT, is a 5.5 room residence located on a .96 acre lot. This property will be referred to hereinafter as the "Hare property."
In case No. 55825, the owners of the property are William Kulas and Kerry Kulas. Their property, 42 Polo View Road, Somers, CT is a 5.5 room residence located on a .98 acre lot. This property will be referred to hereinafter as the "Kulas property."
In case No. 55827, the owners of the property are Anthony Nolasco and Marjolaine Nolasco. Their property, 51 Rye Hill Circle, Somers, CT is a 10 room residence located on a .98 acre lot. This property will be referred to hereinafter as the "Nolasco property."
In case No. 55828, the owner of the property is Erin C. Smith. Her property, 16 Polo View Road, Somers, CT is a 6.5 room residence located on a 2.2 acre lot. This property will be referred to hereinafter as the "Smith property."
In case No. 55829, the owners of the property are Wayne N. Woodworth and Ann Marie Woodworth. Their property, 88 Rye Hill Circle, Somers, CT is a 5.5 room residence located on a .990 acre lot. This property will be referred to hereinafter as the "Woodworth property."
 I
In one of the appeals, the complaint contains only one count. That single count claims that the 1993 assessment on the Colton property is "manifestly excessive." Statutory remedies for "manifestly excessive" assessments are provided in General Statutes § 12-119, and in this memorandum a count that relies on that statute is hereinafter referred to as a "12-119 count."
In the other six appeals, the complaints contain two counts. The first count is brought under General Statutes § 12-117a and is an appeal from the action of the Somers board of tax review (the board). In this memorandum that count is hereinafter referred to as a 12-117a count. The second count in these six appeals is a 12-119 count. CT Page 6691
In those 12-117a counts, the plaintiffs claim that the board's valuation of their properties on the list of October, 1993, for purposes of taxation by Somers violates General Statutes § 12-64. That statute provides that property not exempt from taxation shall be liable to taxation at a uniform percentage of "its present true and actual valuation." The word "present" in that statute has to be read in conjunction with General Statutes § 12-62, which provides for mandatory decennial revaluations. In compliance with that statute, Somers conducted a decennial revaluation in 1984. "`(T)he true and actual valuation' of real property that is required by § 12-64 is ordinarily accomplished by the ten year revaluation that is required by § 12-62." (Internal quotation marks omitted). Paukerv. Roig, 232 Conn. 335, 342, 654 A.2d 1233 (1995). Accordingly, even in 1993, the 1984 valuation of the plaintiffs' properties would ordinarily be the "present true and actual valuation, " because the year 1993 is included in the ten years covered by the decennial revaluation of 1984. See Newberry Commons LimitedPartnership v. Stamford, 226 Conn. 92, 626 A.2d 1292 (Revaluation in 1981. Construction of building completed in 1986. Assessment value as of 1981 had to be established.)
As required by statute, for purposes of local taxation, Somers has assessed property liable to taxation "at a uniform rate of seventy percent of present true and actual value." As used in this memorandum, the word "assessment" refers to that seventy percent and the word "valuation" refers to the one hundred percent valuation.
 II
All of the appeals are dated June 4, 1994, and appealed the assessment on the list of October 1, 1993. In December, 1995, counsel for the plaintiffs had filed a document entitled "Amendments to Application," in which he purported to amend the12-117a counts and the 12-119 counts by adding the grand lists of 1994 and 1995 to the complaint. There was no motion for leave to file an amendment to the 12-119 counts. Counsel for the defendant filed an objection to the "Amendments to Application," on the ground, inter alia, of the one year limitation in General Statutes § 12-119. There was no hearing or decision on the objection, even though General Statutes § 12-119 does not have the same provision authorizing new-assessment-year-amendments that General Statutes § 12-117a has. CT Page 6692
On May 30, 1997, the day all seven cases were assigned for trial, counsel for the plaintiffs offered a document entitled "Statutory Amendment" that reads in part: "(T)o the provisions of the complaint based on the assessment List of October 1, 1993, and List of October 1, 1994, and List of October 1, 1995, is hereby added the List of October 1, 1996."
Although, in the absence of a ruling on the objections to the 1995 "Amendments to Application," those amendments have not been allowed, counsel for the defendant stated that he would not object to adding the lists of October 1, 1994, 1995, and 1996 to the complaints if those added lists are to apply only to the 12-117a
counts and not to the 12-119 counts. The court ruled that, in view of the statement by counsel for the defendant, the court would treat the 12-117a counts as amended by the 1994, 1995, and 1996 lists, and the 12-119 counts as not being amended. Accordingly, this memorandum will consider the 12-117a counts as thus amended.
 III
Pursuant to the defendant's motion, the seven appeals have been consolidated for trial. A separate judgment will be entered, however, in this memorandum for each appeal. By stipulation of the parties, the plaintiffs' seven appeals have been referred to me, as a Judge Trial Referee, for a trial and entry of judgment. In the course of the trial, exhibits were introduced; the court heard testimony from the Somers Assessor and the Somers Sanitarian; heard testimony and received appraisals from both the appraiser for the plaintiffs and an employee of the appraiser engaged by Somers; heard testimony from several of the plaintiffs; viewed the residences while a passenger in an automobile, accompanied by counsel for the plaintiffs and counsel for the defendant; and had the benefit of briefs submitted by counsel for the plaintiffs and counsel for the defendant. (As used in this memorandum, the words "plaintiffs' appraisal" refers to the appraisal of the appraiser for the plaintiffs and the words "defendant's appraisal", to the appraisal of the appraiser for the defendant.)
 IV
As noted previously, the year 1993 is included in the years covered by the decennial revaluation of 1984. In compliance with the purpose of the statutes governing assessments in the years CT Page 6693 between decennial revaluations, the Somers Assessor, on the list of October 1, 1993, continued the assessments that had previously been made on the basis of the 1984 revaluation. In the spring of 1993, however, there had occurred unusual and special circumstances that caused property owners with wells to appeal to the board for a reduction in the assessments of October 1, 1993. Those circumstances are the discovery of, and subsequent intense all-media publicity about, Perchlorethylene (PCE) in 35 residential drinking-water wells in the Rye Hill Circle area. In those wells the concentration of PCE exceeded the allowable limit of 5.0 micrograms per liter that had been established by the Connecticut Department of Health Services.
This discovery caused immense worry and concern to the residents who had been depending on the wells for their supply of water for all purposes. As a temporary remedial measure, the Connecticut Department of Environmental Protection (DEP) installed filters at each of the affected residences. These filters alleviated the immediate problems that would otherwise have arisen from a contaminated water supply. The DEP also targeted, as the probable source of the PCE, the use of PCE in dry-cleaning processing at the Connecticut Correctional Institution (CCI) in Somers. In August, 1993, the DEP determined that the Rye Hill Area is a site that "represents a threat to the environment and public health which is unacceptable." (Exhibit K page 5.) One consequence of this determination is that it made the Rye Hill Area site "eligible for State funded remedial action under the provisions of Section 22a-133f of the Connecticut General Statutes." (Exhibit K page 6.) Another consequence is that the determination, fostered by the attendant publicity it received, attached to the area the stigma of having contaminated wells and polluted water.
Acting on the appeals of the owners of the affected properties, the board reduced the assessment on each of the affected properties by $5,000, except for the Kulas property, where PCE had been detected in the well, but not in excess of 5.0 micrograms per liter. The broad-brush, $5,000 fixed amount approach of the board invites the inquiry whether it is probable that each of the affected properties sustained a decline in value by that fixed amount. Real estate valuation, however, is not capable of surgical precision. "In reviewing valuations, `we must bear in mind that the process of estimating the value of property for taxation is, at best, one of approximation and judgment and there is a margin for a difference of opinion.'" (Internal CT Page 6694 quotation marks omitted; citation omitted) Connecticut Coke Co.v. New Haven, 169 Conn. 683, 668, 364 A.2d 178 (1975). After reviewing the reports and testimony of the appraisers and comparing their opinions about decline in market value with the $5,000 fixed adjustment, the court is of the opinion that the $5,000 adjustment for the affected properties is well within the "margin for a difference of opinion." Nevertheless, the court is of the opinion that a percentage adjustment, rather than a fixed-amount adjustment, is a preferred method because the percentage recognizes the price differences between the properties. Both the plaintiff's appraisal and the defendant's appraisal use a percentage of the assessor's October 1, 1993 valuation to evaluate the decline in fair market value. The plaintiffs' appraiser fixed that percentage at 17.5% and the defendant's appraiser at 10%. After the court's review of the reports and testimony of both appraisers, the court is persuaded that the 10% percentage is more credible.
 V
Although the 10% reduction from the assessor's October 1, 1993, valuation is the more credible, that percentage has to be applied selectively in these appeals because there are two properties that it cannot be applied to, the Colton property, and the Kulas property.
As noted previously, the appeal for the Colton property consisted of only one count, a 12-119 count. The only claim relevant to the provisions of General Statutes § 12-119 is the claim that the Colton property assessment is "manifestly excessive." "Manifestly excessive", however, means more than that the assessor overvalued the property. "[The] plaintiff . . . must satisfy the trier that [a] far more exacting test has been met: either there was misfeasance or nonfeasance by the taxing authorities, or the assessment was arbitrary or so excessive or discriminatory as in itself to show a disregard of duty on their part. Tyler's Cove Assn., v. Middlebury, 44 Conn. App. 517,526-27, 690 A.2d 412 (1997) (Internal quotation marks omitted; citations omitted). General Statutes § 12-119 does not apply "where the claim is merely that the property has been overassessed . . ." Cohn v. Hartford, 130 Conn. 699, 703,37 A.2d 237 (1944). With the $5,000 allowance deducted, the Colton property assessment is $62,550. If the 10% deduction were allowed, the assessment would be $60,795, a difference of only $1,755 from the $62,550. The proof of that small assessment CT Page 6695 difference would be proof, at most, of mere overassessment, not a "manifestly excessive" assessment within the meaning of those words in General Statutes § 12-119. The court finds that the owners of the Colton property have not proved the essential allegation ("manifestly excessive") of their complaint. Judgment must, therefore, be entered for the defendant in case No. CV 94 55822.
The 12-119 counts in the other cases not having been amended, the parties were at issue on those counts only in the original complaint. With respect to those counts, the court finds that these plaintiffs, like the Colton plaintiffs, did not sustain their burden of proving the essential allegation ("manifestly excessive.") Judgment must, therefore, be entered for the defendant on the second count in cases Nos. CV 94 55821, CV 94 55824, CV 94 55825, CV 94 55827, CV 94 55928, CV 94 55829.
 VI
The board did not allow the Kulas property owners a $5,000 deduction, on the ground that the PCE in the Kulas well did not exceed the allowable limit of 5.0 micrograms. That action of the board does not give adequate consideration to the proximity of the Kulas well to the Smith well at 16 Polo View Road, where the contamination did exceed the allowable limit. A prudent prospective purchaser would learn that the pollution came through an aquifer and would know that until the remediation is completed there is no assurance that additional pollution would not enter that well. Applying the 10% deduction to this property, however, does not give adequate consideration to the likelihood that a prospective purchaser would be willing to pay more for a property that did not have contaminants in excess of the allowable limit. Weighing these conflicting considerations, the court finds that a fair and reasonable deduction for the Kulas property on the 1993 list is 5% of the assessor's October 1, 1993, assessment ($56,190) i.e. $2,809, and judgment may enter that the October 1, 1993 assessment of the Kulas property be reduced by $2,809.
Because all of the property owners except Kulas have received a $5,000 deduction, the additional amount by which the October 1993 fair market value of the property of the owners, other than Colton and Kulas, should be reduced is the amount by which 10% of the assessor's October 1, 1993, assessment on their property exceeds $5,000, and judgment may enter finding that the fair market value of their property on the October 1, 1993, list CT Page 6696 be reduced by that amount in addition to the $5,000 reduction of the board.
 VII
The 12-117a complaints having been amended by adding appeals of the lists of 1994, 1995, and 1996, those appeals remain for consideration by the court. Because there was uncertainty about the specific amount of the 1993 assessment being appealed, and because the documents purporting to be amendments did not specify, in dollar amounts, the assessment being appealed, the court requested counsel to file a stipulation setting forth those amounts. That stipulation was filed as Exhibit 5, and the amounts shown therein are the amounts the court treats as to the 1994 and 1995 assessments. No amounts were filed as to 1996, inasmuch as no party claims that the 1996 assessments are different from the 1995 assessments. The amounts shown in Exhibit 5 as to the 1994 and 1995 assessments are the following:
Property Owner
Burnette 1994 List Gross $106,790 Reduction by Town 2,270 (5% of lot assessment) Net 104,520
 1995 List Gross $106,790 No Reduction
Colton 1994 List Gross $113,020 Reduction by Town 2,270 (5% of lot assessment) Net $110,750
 1995 List Gross $113,020 No Reduction
Hare 1994 List Gross $82,090 Reduction by Town 1,920 (5% of lot assessment) Net $80,170 CT Page 6697
 1995 List Gross $82,090 No Reduction
Kulas 1994 List Gross $94,450 Reduction by Town 0 Net $94,450
 1995 List Gross $94,450 No Reduction
Nolasco 1994 List Gross $157,570 Reduction by Town 2,270 (5% of lot assessment) Net $155,300
 1995 List Gross $157,570 No Reduction
Smith 1994 List Gross $117,800 Reduction by Town 2,270 (5% of lot assessment) Net $115,530
 1995 List Gross $117,800 No Reduction
Woodworth 1994 List Gross $104,300 Reduction by Town 2,270 (5% of lot assessment) Net $102,030
 1995 List Gross $101,140 No Reduction
The 1994 revaluation was conducted by the same revaluation-service company that had conducted the 1984 revaluation. The assessor's cards, for 1994 and 1995, for the properties that are the subject of the appeals, have been introduced into evidence (Exhibits 6, 7, and 8), and the court has reviewed them. The cards CT Page 6698 list in detail the items that have been appraised and the estimated value of each of the items. For example, one of the cards lists, under "Dwelling Cost Calculation," many different items in addition to the main structure, including a Jacuzzi, central air conditioning, fire place, outbuildings, and vinyl pool, each with a separate valuation. Each assessment shown on Exhibit 5 is the same as the assessment shown on the assessor's card.
Although 1994 was a decennial revaluation year, the appraiser for the plaintiffs did not conduct a new appraisal but used the valuations in the stipulation as a base, and then applied a fixed reduction of 17.5% to those valuations. The appraiser for the defendant made a new appraisal for the 1994 revaluation.
On the issue of the valuation of the plaintiff's properties on the list of 1994, the court has reviewed the evidence relative to that issue, including the testimony of the witnesses, the testimony and report of the appraisers, and the cards of the assessor. As a result of that review, the court finds that the valuations in the stipulation (Exhibit 5) are the most credible of the different valuations that have been offered in evidence. The court notes that in the stipulation there is no percentage reduction for the Kulas lot, and the court finds correct the no-reduction in view of the change in circumstances resulting from remediation in the intervening year. That change is evidenced, inter alia, by the certain availability of a public water supply in November 1994. The court also notes the decline in assessment of the Woodworth property from 1994 to 1995, even though all the other properties (except Kulas') increased in valuation. The explanation for that unique deviation is that in the 1994 Woodworth valuation an air conditioning system was erroneously included in the property evaluated, and the correction was made in the 1995 valuation.
The reason the assessments increased on all the plaintiffs' properties between 1994 and 1995 (except Kulas' and Woodworth's) is that for the 1995 valuation the assessors used the 1994 valuation and then increased that valuation by the amount of the 5% land-only allowance of 1994. Thus the credibility of the 1994 valuations in Exhibit 5 carries forward to the 1995 valuations in Exhibit 5. Because no party claims that there are unusual or special circumstances that justify different valuations for 1996, the valuations in Exhibit 5 for 1996 are the same as the CT Page 6699 valuations for 1995.
In Stamford Apartments Co. v. Stamford, 203 Conn. 586, 589,525 A.2d 1319 (1987), the Supreme Court said: "[W]hen a property owner challenges the assessor's valuation, `the plaintiffs' burden . . . is a difficult one. [P]roper deference must be given to the judgment and experience of assessors. Connecticut Coke Co. v.New Haven 169 Conn. 663, 668, 364 A.2d 178 (1975). The law contemplates that a wide discretion is to be accorded to assessors, and unless their action is discriminatory or so unreasonable that property is substantially overvalued and thus injustice and illegality result, their opinion and judgment should control in the determination of value for taxation purposes. Federated Department Stores, Inc. v. Board of TaxReview, 162 Conn. 77, 86, 291 A.2d 715 (1971), quoting BurrittMutual Savings Bank v. New Britain, 146 Conn. 669, 675,154 A.2d 608 (1959).' (Emphasis added in original.) Uniroyal, Inc. v.Board of Tax Review, 182 Conn. 619, 633-34 n. 8 438 A.2d 782
(1981). While we have recognized that proper deference should be accorded to the assessor's valuation, we have never characterized such deference as a presumption in favor of the validity of the assessment which it is the plaintiff's burden to rebut." (Internal quotation marks omitted.) Although there is no presumption in favor of the validity of the assessment, the property owner has the "burden to establish that the defendant's valuation was excessive." Stamford Apartments, at 590. "The burden in such a proceeding as this, as in other actions, is upon the plaintiff to prove his material allegations." Thaw v.Fairfield, 132 Conn. 173, 179, 43 A.2d 79 (1945).
The plaintiffs have not sustained their burden of establishing that the assessor's valuations are excessive. Accordingly, judgment may enter for the defendant on the first counts, as amended by the 1994, 1995, and 1996 assessment years, in the following cases: Nos. CV 94 55821, CV 94 55824, CV 94 55825, CV 94 55827, CV 94 55828, CV 94 55829.
 VIII
Throughout the trial, counsel for the plaintiffs urged the court to find that the well pollution and the attendant publicity "eliminated the marketability of the home properties of the seven plaintiffs." (Plaintiffs' brief p. 2) In his brief, counsel for the plaintiffs cites cases where circumstances analogous to the well pollution have caused a reduction in the value of property. CT Page 6700 There is, however, a big difference between property that is worth less and property that is worthless. In 1993, the contamination of the wells certainly made the plaintiffs' property worth less, but the contamination certainly did not make the plaintiff's property worthless. The cases cited by counsel for the plaintiffs lend no support to their claim that their houses and lots were or are worthless.
In his brief, counsel for the defendant cites authorities (pages 4-7) and reasons (pages 7-8) for rejecting the claim of the plaintiffs that their properties have no market value. A copy of those pages of the defendant's brief have been annexed to this memorandum as an appendix. In his brief, the defendant concludes, "In the present case the court should reject the notion that the properties have no market value" (defendant's brief p. 7) and "The only credible evidence proves that each of these homes had a market value as of October 1, 1993, 1994, 1995 and 1996." (Defendant's brief p. 8.) The court concurs completely in these conclusions of the defendant.
 IX
The following judgments may enter:
1. For the plaintiff(s) on the first count, for the 1993 assessment year:
OWNER CASE NUMBER FAIR MARKET VALUE ASSESSMENT
Burnette CV 94 55821 $88,804 $62,163
Hare CV 94 55824 68,284 47,799
Kulas CV 94 55825 76,257 53,380
Nolasco CV 94 55827 108,887 76,221
Smith CV 94 55828 94,217 65,952
Woodworth CV 94 55829 79,945 55,962
2. For the defendant on the first count in case number CV 94 55822 (Colton).
3. For the defendant on the second count, in all cases having a CT Page 6701 second count.
4. For the defendant on the 1994, 1995, and 1996 amendments to the complaint.
If either counsel is of the opinion that any of the foregoing judgment does not correspond to text of the remainder of this Memorandum of Decision, counsel is requested to notify Faith E. Yarusewicz, Judges' Secretary, who will schedule further proceedings.
RUBINOW, J.
APPENDIX A
Connecticut courts have described fair market as "the most probable price, as of a specified date, in terms of money, for which a property should sell after reasonable exposure in an open and competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self interest, and assuming neither is under duress". Meadow Street Developers v. Town of Montville,
1995 CT Sup 11569.
The plaintiffs argue that their properties can have no market value because no market exists in which to sell their homes. They insist that no one would buy their homes because of the stigma of the contamination, the fear of the unknown and the fact that their properties are listed on the State's Superfund List.[1] During trial, Ralph Burnette testified that no knowledgeable buyer would be willing to purchase his home. Each of the other plaintiffs joined in Mr. Burnette's theory of value. The plaintiffs' expert, however, testified that each of the homes did have a market value.
The argument advanced by the plaintiffs is not a novel one. Many courts, including courts in Connecticut, have rejected the notion that contaminated property necessarily has no market value. In Lehigh Petroleum Supply, Inc. v. Board of Tax Reviewof the City of Norwich, 5 CONN. L. RPTR. 270, 6 C.S.C.R. 1126 (1991), the court discussed the impact of environmental contamination on value. The court could find no guidance from Connecticut courts so it adopted the holding in Inmar Associates Inc. v. Borough ofCarlstadt 112 N.J. 593 (1988). The plaintiffs in Lehigh, as inInmar, had argued that their contaminated properties had no CT Page 6702 value because no buyer would ever purchase them. The plaintiffs also argued that the assessment of their properties should be decreased by the costs of cleanup, dollar for dollar. They contended that this dollar for dollar reduction would result in negative value.
The Inmar court rejected a dollar for dollar cost approach in valuing contaminated property. Rather, it equated clean up costs with deferred maintenance. The Lehigh court agreed, stating that "simply because cleanup costs will affect the owner's profits does not automatically require a reduction in tax assessment . . . An owner's expenditures of cost are never conclusive on the question of value" Lehigh at 1130.
More importantly, several courts have explicitly rejected the theory that contaminated, unmarketable property has no value. In Boekeloo v. Board of Review of the City of Clinton,529 N.W.2d 275 (1995), the Iowa Supreme Court held that "(t)he transitory absence of a market does not eliminate value . . . The mere fact that a property is unmarketable does not mean it has no value, especially when it is being used for its intended purpose." Boekeloo at 278. This theory is referred to as "value in use" and has been accepted by other courts, including the courts in North Carolina and New Jersey.
In Re Camel City Laundry Company, 472 S.E.2d 402 (1996) the plaintiff had argued that since no willing buyer could be found to purchase his property it was valueless. The court held that the "willing buyer" used in the definition of market value was a hypothetical buyer in a hypothetical sale. The court decided that it could "find no basis for assigning a tax value of $0 to this property when the contamination does not prevent the present or future owners from putting the property to its highest and best use." In Re Camel City at 414.
Further the Inmar court also accepted the theory of "value in use." "True value for assessment purposes is based upon hypothetical conditions and not particular sales conditions . . . Hence, when property is in use, normal assessment techniques will remain an appropriate tool in the appraisal process."Inmar at 607, 608.
Outside of the context of contaminated properties, Connecticut courts have never equated the absence of a market with zero value. In Connecticut Light and Power Company v. TownCT Page 6703of Monroe, 149 Conn. 450 (1962), the Supreme Court held that where no market exists, the comparable sales approach for determining value cannot be utilized. It would be proper, however, in these cases, to resort to other methods of ascertaining true and actual valuation.
Further, a property's proximity to an adjacent superfund site does not destroy its value. The plaintiff would still have the burden of presenting credible evidence as to a property's true and actual value. (See Brophy v. Town of Southington Docket No. CV94-0462673 September 7, 1995; and Reliable ElectronicFinishing Co, Inc. v. Board of Assessors of Canton, 410 Mass. 381
(1991).
In the present case, the court should reject the notion that these properties have no market value. First, the testimony of each of the plaintiffs is not credible in view of the actual sales which have occurred in Rye Hill since 1993[2]. Further, the testimony that these properties have no value (and presumably no equity) is not credible in light of the twenty mortgage deeds on contaminated Rye Hill properties introduced at trial. Since this testimony is not credible, it should be rejected.
Second, the plaintiffs' own expert testified that each of these homes had a market value. Third, each plaintiff testified that they were using their homes for their intended purpose, as a residence. Consequently, each property had a "value in use". Fourth, uncontroverted evidence established that the plaintiffs were not required to expend any sums to clean up their contaminated wells. These costs are being borne by the responsible party (the DOC). Accordingly, no reduction in value should be made for these properties. Fifth, the major environmental concern, the availability of a permanent, safe drinking water supply has been remedied and the remediation of the aquifer has commenced. This means that the environmental problem is somewhat transitory in nature. As pointed out in the cases discussed above, transitory effects on the market do not effect market value.
Lastly, and most importantly, the plaintiffs testified that they have not tested their theory regarding the lack of a market in Rye Hill. None of the plaintiffs have attempted to market their homes. In fact, several testified that they have no intention of selling their homes. The evidence adduced at trial CT Page 6704 established that anyone who put his home on the market was able to sell it.
Given all of these considerations, the testimony of the plaintiffs is not credible. The only credible evidence proves that each of these homes had a market value as of October 1, 1993, 1994, 1995 and 1996.